Our final case for this morning is Jermaine Jackson v. City of Peoria. Jermaine Jackson v. City of Peoria, Illinois Morning, Your Honors. Mr. Kamen. Well, the primary issue in this case is probable cause. And there was illusory probable cause. It seemed to me clearly an issue for the trier fact. The judge took it away from the trier fact and granted summary judgment. I don't see why there's a probable cause problem if two different people have picked out this man from the photo lineup. It certainly means there's still something to be tried, and Mr. Jackson had a trial, and he was acquitted, and so he received that process, which was due. But you seem to think that the police have a much higher burden to gather together evidence that points to a certain person before probable cause exists than I think the law would support. I mean, two different witnesses on a photo lineup, and Mr. Hines testified that he had an opportunity to observe. Bullock also had an opportunity to observe. Well, the witnesses, there was an initial lineup. There was an initial identification, which actually was consistent with the profile. Right, Michael Ralph, but that's a little bit waffly. But then Bullock in the next lineup, which is actually a week later or so, six days later, goes to Jackson's picture. And for some reason, there's a second lineup in which, as you point out, Mr. Bullock goes to Mr. Jackson's picture. Mr. Jackson happened to be in the police station on that day talking with police about his son. He had a long history with the police, particularly with the defendants, and with that long history, then suddenly he becomes a suspect. So what did the police do wrong? Well, we have two waffling eyewitnesses. We have police who want to get revenge on Mr. Jackson. Well, we're not going to worry about their subjective motives right now. What concretely did they do wrong? Surely they can put Mr. Jackson's photograph in the lineup. They put lots of innocent people's photographs in the lineup, or the photo lineup, because that's how you give witnesses a choice. Well, theoretically, if you go by that probable cause and that theory of probable cause, you could do that with anybody. Once the police find out that they've got a couple of witnesses who say, well, hey, we can't identify who the person is, we're not sure the person was wearing sunglasses, we're not sure, and they do that with the lineup, and then the police are like, aha, we can get back at somebody. But you have to assume that the witness was going to pick this person. I mean, they had no reason to think in the October 27 lineup that anybody was going to pick Jackson's picture. You're not accusing the police of having an unduly suggestive lineup. Correct me if I'm wrong, but I didn't see that in this case. Well, at this point, during the civil case, and that wasn't one of our civil claims. No, that wasn't one of the civil claims that the criminal case had been disposed of, so there wasn't any reason to suggest that. There seems to be a clear motive of the police. They put in this person who's 6'5", 250 pounds, they put him into a lineup. The only thing you're getting from witnesses is, well, hey, maybe, I mean, the person who was the first person into the house was 5'8", 5'9", 180 pounds. Don't you think that's the reason maybe he got acquitted? Maybe he just looks so different? I mean, we have a probable cause stage that lets you get to trial, and then we have a trial stage where you have to be proven guilty beyond a reasonable doubt. Well, if we have the, right, but if the police know, I mean, there's illusory probable cause where the police know that they don't have probable cause, but they're going to use the system. I mean, that's basic malicious prosecution is using the system for some other purpose than to try to get. Yeah, but I want to know where's the concrete evidence that this kind of abuse of the system is going on? Well, that's the basis of this case, and that they do have the history, and that didn't come out in the record, but, I mean, the deposition that was taken of my client at that point was taken by the defendants and not taken by me, but at trial that would clearly be what would come out and the history would come out between them and the history of what these police do. And they're, I mean, the officers, these two particular officers are known for doing, for having this kind of attitude, and obviously if we have that, go by that definition of probable cause where somehow probable cause was involved, we, I mean, an officer could choose to pin a crime on anybody, basically. They'd go, aha, we've got a waffling witness, we can pin the crime. But I still don't see why that would make Mr. Hines or Mr. Bullock pick Jackson's picture out of the second photo lineup as opposed to anybody else's if that, unless you attribute some sort of bad motive to Hines and Bullock, but we're not doing that. They thought they saw a match, perhaps they were wrong. You know, people can make mistakes like that. But you have to add the fact that the witnesses who were not coached, there's nothing wrong with the lineup, the witnesses each independently select Jackson's picture. The witnesses, they're, I mean, the question is why, how does Jackson get into there in the first place? No, no, I understand. You're unhappy that the picture is part of the menu, but I'm not clear why that's inevitably a problem. Inevitably? It could look nothing like the robber, for example, and they would never pick him. Well, if they knew him, and they said that, well, if anybody looks like him, it would be Jackson, not knowing that he's, you know, doesn't look, he's not the height, he's not the weight, he's not anything. Okay, so they don't know it, and then later on, they're confident in their description. I mean, they seem just like normal, ordinary witnesses, you know, mistaken witnesses. And the question is who put the mistake in. I think we have plenty of sufficient evidence to show that the police are the ones who put that mistake into the witnesses and put Mr. Jackson through a year of jail and a year of having to go through this, and put him through the potential of going through, you know, 30 years of this. And so that's, I mean, that's really, that was the purpose of bringing this case, and I really believe it was for the trier of fact to determine that. Okay, well, if you want to save a little bit of rebuttal time. Oh, I'm sorry, I do. Thank you. It'll be fine. Mr. Jannettan. Good morning, Your Honor, and thank you. May it please the Court, my name is Peter Jannettan, and I'm here on behalf of Detectives Moore and Garner and the city of Peoria. And just to kind of briefly address a couple of matters, since I know we're getting close to noon here, the motives of the police officers, as you indicated, are not relevant to the question of probable cause and really are not a factor for most of the claims here. To the extent that counsel is indicating that he would have brought this up because it was relevant to the malicious prosecution, he could have raised that by affidavit at the summary judgment stage, to the extent that the affidavit would not be inconsistent with his deposition testimony, and he did not do so. And he's indicated some question, you know, that for some reason, apparently unknown to him, his client was included in this lineup. The reason he was included in the lineup is because his own children, who were being questioned about burglaries, implicated Jermaine Jackson and said, you know, my dad's putting my brother up to doing some of these burglaries. So there was some suggestion that he might be involved in some of these cases, so they put him into a lineup and the witnesses identified him. With respect to some of the other issues, one thing I did want to address as far as the fair trial issues, that was not gone into as much depth in the briefs as I probably should have. Beginning at page 697 of the record was Detective Garner's trial testimony, and he was cross-examined about the identifications that was addressed at his trial. So the plaintiff, Mr. Jackson, defendant of the criminal case, was aware of the issues that he's raising now, had the opportunity to raise those at his criminal trial, and therefore was not denied a fair trial. And to the extent that he points to some of the other defendants, Mr. Hughes and other people as people we should have been looking at, as he's also indicated these were newsworthy events and they were all very familiar with him at the time, so he was aware of those and able to raise those at the criminal trial. So unless the court has any particular questions for me, I'm prepared to rest. Apparently not, so we thank you very much for being here. Thank you very much, Your Honor. It's an honor and a pleasure as always. All right. Anything further, Mr. Kamen? Okay, there was the child that Mr. Jackson was at the station talking about. I mean, that's clearly for the trier of fact to decide, was that the police's incentive or was that the reason they put him there? Or after they decided to put him, this 6'5 person in a lineup, or theoretically there was a 5'8 person involved, is a jury going to decide, well, hey, the child is the reason that he was in the lineup, or are they going to decide, well, hey, there was some nefarious motive for putting him in the lineup? I think it's clear that a reasonable jury would find that the police had the motivation to do it. So, I mean, if there are any questions. All right. Apparently there are no other questions. Thank you very much. Thanks to both counsel. We'll take the case under advisement and the court will be in recess. Thank you.